# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA


LINDA K. BUTIA,           )
                Plaintiff,    )
                         )     **Civil Action No. 12-1248**
        vs.                )     **Magistrate Judge Maureen P. Kelly**
                         )
                         )     **Re: ECF No. 26**
THE BANK OF NEW YORK MELLON, )
                Defendant.   )


## OPINION AND ORDER


**KELLY, Magistrate Judge**

## I.    INTRODUCTION

Pending before the court is a Motion for Summary Judgment (ECF No. 26) filed by

Defendant The Bank of New York Mellon ("Defendant" or "BNY Mellon"). Plaintiff Linda K.

Butia ("Plaintiff" or "Butia") initiated this action on August 29, 2012, by filing a three-count

"Complaint in Civil Action" (ECF No. 1) alleging: (i) sex discrimination under Title VII of the

Civil Rights Act of 1963, 42 U.S.C. § 2000e et seq ("Title VII"); (ii) age discrimination under

the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"); and (iii) age

and gender discrimination under the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 et

seq. ("PHRA"). On November 2, 2012, BNY Mellon filed an Answer to the Complaint. (ECF

No. 3).

Following discovery by both parties, BNY Mellon filed a motion for summary judgment

and a brief in support. (ECF Nos. 26 and 27). The parties filed a joint statement of undisputed

facts (ECF No. 26-1 and refiled at ECF No. 30), as well as separate supplemental statements of facts (ECF Nos. 26-2, 31 and 33). Plaintiff filed her response in opposition to the motion for summary judgment (ECF No. 28), and BNY Mellon filed a reply to Plaintiff's response (ECF No. 34). In addition, both parties filed supplemental briefs addressing the timeliness of Butia's PHRA claim (ECF Nos. 39 and 40). The parties have filed extensive exhibits in support of and in opposition to the motion for summary judgment, which have been reviewed in detail by the Court. (ECF Nos. 26-1 through 26-9 and 28-1 through 28-11).

After consideration of the parties' submissions and the applicable legal principles, the Court concludes that in light of the summary judgment standard of review and based upon the evidence of record, Plaintiff cannot prove that a similarly situated employee received more favorable treatment with respect to the elimination of her position in BNY Mellon's merged reconciliation and reporting department or that BNY Mellon's reason for her termination was pretext for discrimination under state or federal law. Accordingly, for the following reasons, the motion for summary judgment filed by BNY Mellon will be GRANTED.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The factual background is derived from the undisputed evidence of record and the disputed evidence, viewed in the light most favorable to the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Butia, who was born on July 8, 1953, graduated from Westminster College in 1975, with a Bachelor of Arts degree in Business Administration. (ECF No. 30, ¶ 5; ECF No. 33, ¶ 1). Butia became a Certified Public Accountant in 1978, but for all times relevant to this action, had let her certification lapse into inactive status. (ECF No. 33, ¶ 2). Beginning in 1979, Butia was

employed by Mellon Financial Corporation.  Plaintiff began her career at Mellon serving as a controller in the collections services group, rising to a position as a manager in the group in 1988, and remaining in the department until 1995.  (ECF No. 26-3, pp. 4-5).  During the years 1996-1999, Plaintiff worked in service delivery, where she "worked on developing business recovery plans, risk assessment documents" in instances where a business would lose office space or other systems. (ECF No. 26-3, pp. 4-5).   For the period 1999 through 2004, Plaintiff worked in securities processing, eventually becoming a Vice-President and Manager of Securities Processing.  (ECF 26-3, p. 4).  Plaintiff's job responsibilities required her to prepare "monthly expense management reports for the group to senior management." Id.  In 2004, Butia joined Mellon's Reconciliation Services Group ("RSG"), where she remained until her eventual termination.

The RSG functioned to cross-check certain cash and securities transactions to ensure that the correct securities were added to or withdrawn from the correct client account, and to reconcile any inconsistencies.  Plaintiff joined the RSG as an Operations Manager of Back Office Cash and SIG Reconciliation. Judy Eiben, a woman older than Plaintiff, served as the Managing Director of the RSG.[1]  (ECF No. 26-3, p. 5). Eiben previously had supervised Plaintiff and had reduced Plaintiff's pay grade from pay grade 11 to pay grade 10, and moved her from an outside office to a cubicle.  Plaintiff attributes these moves, which she concedes had a detrimental impact on her career at Mellon, to a personality conflict.  (ECF No. 26-3, p, 19).

In late 2004, Judy Eiben hired Stuart Smith ("Smith") as Manager of the RSG. Smith was compensated at pay grade 12 or greater, and at the time Smith was hired, he was approximately 35 years old.  (ECF No. 26-1, ¶¶ 7-13, 26).  Smith's directives from Judy Eiben were to manage the RSG's operations, centralize its reconciliation processes and functions, implement

---

[1] Ms. Eiben's date of birth is October 2, 1953.  (ECF No. 31, ¶ 2).

standardized technology to support the RSG's processes, and attempt to move reconciliation services work to a lower cost center in India. (ECF No. 26-1, ¶15). Plaintiff concedes that she was not qualified to apply for Smith's position. (ECF No. 26-3, p. 5). Plaintiff also candidly admits that in the years she worked for Smith, she never heard him make any derogatory remarks about anyone based on gender or age. (ECF No. 26-3, p. 13). Butia believes, however, that Smith discriminated against her based upon her age and sex when he re-engineered the RSG, leading to the elimination of her position and her termination. (ECF No. 26-3, p. 4).

In early 2005, Smith hired Jay Kucinic, a male, as a project manager at pay grade 12. (ECF No. 28-5, pp. 11-14). As a project manager, Kucinic was to assist in the development of a reconfiguration process. Smith's goal was to centralize cash reconciliation with one person, centralize securities reconciliation with another person, and centralize and standardize reporting with a third person. (ECF No. 28-5, p. 10). In addition, Smith sought to standardize department functions and technology.

One of the first changes was to transition Butia to a new non-operations position as Manager of Reporting and Risk. This move was in conjunction with Smith's goal of standardizing and consolidating the financial reporting produced by the group. (ECF No. 26-1, ¶ 28). Plaintiff states that this project position was "part of the plan from the beginning," and was created by Smith's predecessors Joe Rossi and Steve Towbridge. (ECF N. 26-3, p. 10).

Until this change, the reporting functions were split between two groups – U.S. transactions and non-U.S. transactions. (ECF No. 26-1, ¶ 29). Brad Skrlac, an Operations Manager, performed the U.S. reporting functions, and Emily Sutliff, an analyst located in Everett, Massachusetts, performed the non-U.S. reporting functions.

As Manager of Reporting and Risk, Butia no longer served as an Operations Manager, and no longer supervised eight employees in the Back Office Cash group. However, her compensation remained unchanged and Butia assumed supervisory responsibility over Emily Sutliff, who continued to work in Everett, Massachusetts. Butia would meet with Sutliff personally several times a year. (ECF No. 26-1, ¶¶ 29-35; ECF No. 26-3, pp. 38-39 (diagrams of staffing changes)). Plaintiff remained in this position until her termination. Plaintiff contends that at the time of the position change, she voiced concerns about her reduced supervisory role to Smith and to a representative in Human Resources, but acknowledges that her move into the position of Manager of Reporting and Risk was voluntary. In addition, she did not voice any concern that the move occurred because of her age or sex. (ECF No. 26-3, p. 10). Smith testified that the move was designed to provide Butia with some project management experience. (ECF No. 26-4, p. 16).

At the time of this transition, the RSG's three other Operations Managers were men. Anthony So, born on January 18, 1964, was Operations Manager of Global Cash, Global Securities, and Global Suspense. (ECF No. 26-5). So was located in the Everett, Massachusetts office, where he supervised 6 employees based in the United States and sixteen employees located in India. Sylvester Hairston, an African-American located in Pittsburgh, Pennsylvania, was born on January 9, 1952, and served as Operations Manager of U.S. Suspense, handling U.S. Cash reconciliation. Hairston supervised nine employees. Id. Butia's former operations responsibilities over Back Office Cash and SIG were transferred to Brad Skrlac, who performed these functions as well as his own existing duties as Operations Manager over U.S. Depository and DDA Reconciliation. In this position, Skrlac supervised eleven employees. (ECF No. 26-1, ¶ 36; No. 26-3, p. 39). Brad Skrlac was born on October 31, 1972. (ECF No. 26-5).

Pursuant to Eiben's directive, Smith continued to move certain operations to India and by December 1, 2005, there were approximately 20-22 full-time RSG employees in India (ECF No 26-1, ¶ 46). In 2006, the RSG again was reconfigured so that new functional titles were created for each reconciliation services job, and all employees were "mapped" to the appropriate position. (ECF No. 26-1, ¶ 48, No. 26-3, p. 42).

As part of the mapping, Plaintiff continued to perform the job of Manager of Reporting and Risk; however, based on her salary grade, she was given the new title of Recon Services Group Manager II, pay grade 11. Prior to the title change, Smith had increased Butia's compensation from pay grade 10 to pay grade 11, to address the fact that she was near the top of pay grade 10 and would otherwise not be eligible for merit raises. He also wanted to recognize Butia's good performance. (ECF No. 26-1, ¶¶ 25-27; ECF No. 26-4, p. 12). By March 2006, Plaintiff supervised two employees, one located in Pittsburgh and Emily Sutliff, who remained in Everett Massachusetts.

In conjunction with remapping the department, Anthony So and Sylvester Hairston were given titles of Recon Services Group Manager I, at pay grade 10. Brad Skrlac was removed from his role as an Operations Manager to become one of three Project Managers reporting to Jay Kucinic. (ECF No. 26-3, p. 42). His pay grade, as well as the pay grades of the other two project managers, Karen Cain and Rebecca Dammeyer, was set at pay grade 10.[2] Skrlac's former functions were handed over to Randy Rihmland, age 41. Over the course of the transition, Rihmland was given the new title Recon Services Group Manager II, based on his salary grade at pay grade 11. (ECF No. 26-1 ¶¶ 50, 63; No. 26-3, pp. 11-12, 42-45).

---

[2] Karen Cain, a woman, was born March 28, 1970, and Rebecca Dammeyer, also a woman, was born on February 14, 1980. (ECF No. 26-1, ¶¶ 57-58).

Rihmland joined the RSG from a strategic operations group, where he had been a project manager and had authored a book on operations management that was in the process of being published. Rihmland also had extensive re-engineering experience, which was consistent with the RSG's overall strategy. (ECF No. 26-1, ¶ 65). After taking over Skrlac's position, by March 2006, Rihmland supervised twelve employees. (ECF No. 26-1, ¶ 66, ECF No. 26-3, p, 45). Id. By December 2006, the number of RSG employees in India had increased to 25 as more RSG functions were shifted out of the United States, and the number of RSG employees in the United States was reduced, with Rihmland supervising eight employees. (ECF No. 26-3, p. 45). Plaintiff continued to supervise two employees.

In 2006, Eiben and Smith approved Six Sigma (process improvement) training for each of the three Project Managers reporting to Jay Kucinic – Karen Cain, Rebecca Dammeyer and Brad Skrlac. (ECF No. 26-1, ¶ 59). Smith did not approve the training for any of the Operations Managers that reported to him, including Plaintiff. Plaintiff requested the training and forwarded her request to a senior manager, several levels above Smith. However, she was told that there were only three Six Sigma projects available and the projects were to be assigned to the three Project Managers. Of the three Project Managers, two were women. (ECF No. 26-3, p. 13).

During this same period, Mellon Financial Corporation changed its stock option compensation plan. Under the new plan, only employees who occupied pay grade 12 or greater met the eligibility criteria for an award of stock options. Employees who occupied jobs below pay grade 12 could receive a stock option award if (1) he or she received an award in 2004, and (2) his or her manager recommended that they receive an award. However, managers were not required to recommend stock awards to participants in salary grades 11 or below. (ECF No. 26-1, ¶¶ 38-41).

Plaintiff received stock options in the years 1997 through 2004, but did not receive stock options after the change in policy. At the time the change went into effect, she was at pay grade 11. Stuart Smith decided not to recommend stock options for any employees under his supervision at or below pay grade 11. (ECF No. 26-1, ¶¶42-44). Plaintiff alleges that two younger males did receive stock options in her department, Kucinic and Stuart Smith; however, she concedes they were at least at pay grade 12, and therefore patently eligible. (ECF No. 26-3, pp. 6-7). Plaintiff believes that other employees were "grandfathered" and provided stock options, but the only individual identified by her, Colleen Krugh, was employed in the Asset Servicing department and supervised by another manager. BNY Mellon indicates that Ms. Krugh's date of birth is November 3, 1952, making her one year older than Plaintiff.

On July 1, 2007, Mellon Financial Corporation merged with The Bank of New York, forming BNY Mellon. The parties agree that one of the goals after the merger was to move work from high cost to low cost centers, such as India. (ECF No. 26-1, ¶ 70). During the post-merger transition, additional RSG Operations functions were relocated out of the United States and by July 2007, there were 31 RSG employees in India. (ECF No. 26-1, ¶ 76).

In December 2007, Kevin Smith became the managing director of the RSG and assumed the role of Stuart Smith's supervisor. (ECF No. 26-1, ¶ 75). By this time, Karen Cain, Rebecca Dammeyer and Jay Kucinic had left RSG and their positions as Project Managers. Brad Skrlac was the only remaining Pittsburgh-based Project Manager. (ECF No. 26-1, ¶¶ 78-79). Skrlac was assigned as the Project Manager Re-Engineering Offshore. Before her departure, Rebecca Dammeyer had been the Work Flow Project Manager. (ECF No. 26-3, p. 49).

On March 31, 2008, Smith hired John McCracken, age 34, as a Project Manager, to be located with him in Everett, Massachusetts, at pay grade 10. (ECF No. 26-1, ¶ 80, 26-3, p. 51).

Prior to joining Mellon, McCracken had conducted project management work in a technology group where he had reconfigured new computer websites. In addition, McCracken had performed technology-based automation projects involving reconciliation processes and possessed technical skills not otherwise available to the RSG. McCracken was not a college graduate, but he had several years of project experience. (ECF No. 33, ¶¶ 3-4, 6; ECF No. 31, ¶ 20). Smith reached out to McCracken when the Everett-based opening was created. He had previously met McCracken when McCracken worked at Mellon as an outside computer and networking technician. (ECF No. 26-4, pp. 25-26; ECF No. 26-1, ¶¶ 80-83). McCracken, like Butia, did not have any Six Sigma training, but he was hired "purely because of his technology background. His experience was with relational data bases and developing small technology solutions for reconciliations." (ECF No. 26-4, p. 26). Plaintiff did not apply for the Everett-based project manager position, nor did she apply to replace Kucinic or Dammeyer. (ECF No. 26-3, p. 16 (transcript p. 61, lines 13-19)).

In April 2008, the RSG had offices in Pittsburgh, Brooklyn, New York, and Syracuse, New York. Plaintiff continued to supervise two employees, Rihmland supervised twelve employees, and Skrlac was working on a loan project. McCracken was located in Massachusetts and 33 employees were performing RSG operations in India with operations assistance from So and Hairston.

At the time of the merger, BNY's Syracuse reconciliation group was managed by a woman, Lula Staples ("Staples"). Staples was born on March 6, 1946. Shortly after the merger and realignment, the Syracuse office was reduced to three employees as additional reconciliation operations were moved off-shore or to Pittsburgh. (ECF No. 26-1, ¶¶ 73, 87-89). In July 2008, Kevin Smith decided to close the Syracuse office and consolidate all BNY reconciliation work

into Mellon's RSG.  Lula Staples was offered the opportunity to transfer to Pittsburgh, but she declined and opted to retire. Id.

Around this same time period, Butia began applying for other BNY Mellon positions outside of her department.  Butia agrees that Smith recommended several open positions to her, for which he thought she was a good candidate. However, Smith did not contact any other group managers on her behalf because he was not in the practice of extending personal referrals for his employees.  (ECF No. 26-1, ¶¶ 90 – 91).  Butia applied for several openings, even those for which she felt she was overqualified, but was rejected as having insufficient current financial experience.  These positions included functioning as a Team Leader - Private Wealth Management Risk and as a Team Leader - Risk Manager for Asset Servicing. (ECF No. 26-3, pp. 16-17, 19-20).

Smith classified Butia as a "strong performer" in her annual reviews. (ECF No. 26-1, ¶ 92). When discussing career options for growth, Butia indicated that she was unwilling to relocate out of Pittsburgh for another BNY Mellon position.   (ECF No. 26-3, p. 20).

In the middle of 2008, BNY Mellon conducted a "reduction in force exercise" and Kevin Smith instructed Smith to identify opportunities to reduce the number of individuals directly reporting to him.  (ECF No. 26-1, ¶ 96, ECF No. 26-4, p. 31).  Smith's "direct reports" included Operations Managers Anthony So, Sylvester Harrison, Randy Rihlmand; Reporting Manager Butia; and Project Managers Brad Skrlac and John McCracken.  Smith made the decision to recommend Butia's termination and the reassignment of her reporting duties to Brad Skrlac, who had performed reporting work prior to the initial 2005 reorganization of the RSG.  (ECF No. 26-4, p. 32).

In his deposition, Smith testified that after examining each of his direct reports, Butia's position was the only position that readily could be absorbed by another manager, specifically Skrlac. His decision was predicated upon how he could move responsibilities to consolidate the department. He also reviewed each employee's "skill sets, expertise, and where there was the least risk. Meaning giving someone functions that they had never done before versus moving work around to people that had previously done that work before." (ECF No. 26-4, pp. 31 – 32). He determined that actual operations work was "the most risky" and viewed So, Hairston and Rihmland as too important to eliminate at the time.

According to Smith, So was the architect of the Global Custody Recon Process and was directly supporting the RSG operations in India. Hairston's group of employees was producing additional work and required his supervision and expertise. Both men were viewed as the "subject matter experts" who were called often to resolve issues and who were necessary to continue migrating operations work to India or, in the case of SIG Reconciliations, to organize the cessation of operations altogether. (ECF No. 26-4, pp. 32 – 33). Further, Rihmland had extensive project experience and had worked for several years in the Operations Strategy Group re-engineering and off-shoring functions. (ECF No. 26-4, pp. 34 – 35).

After reaching the decision that So, Rihmland and Hairston were vital to ongoing restructuring, Smith looked at the functions, skills and expertise of his three remaining managers: Skrlac, McCracken and Butia. (ECF No. 26-4, p. 33). Brad Skrlac had "the most diverse [background] between project management, some of the Six Sigma work, but minor, had done some reporting, so at least understood the fundamentals of the reporting. And [he] had at least ten years of operations management experience," obtained while working as a fiduciary control supervisor in operations, and in the RSG. Id. Skrlac also supervised over a dozen employees.

(ECF No. 26-1, p. 7). McCraken had operational experience, project experience and most importantly, technology experience, that no one else could offer. "The technology experience was what I was looking for, because I did not have the big project to [refer out to the] … new technology [department], and any of the additional smaller technology work John [McCracken] was able to facilitate quickly." Id. Smith evaluated "the current and future needs of the group ... and weighted that there would be more and more technology demands on the group." (ECF No. 26-4, p. 34).

Smith's understanding of Butia's background did not compare favorably, because while he believed she had limited operations and project management experience, on par or a bit more developed than McCracken, she did not have any technical expertise. Smith recalled that Butia struggled with Excel spreadsheets when her staff was absent from work. While he acknowledges that Butia's "strong" performance reviews are better than McCracken's "on-target" reviews, McCracken's technology background rendered him "more important." In comparison to Skrlac, she supervised two employees; had little comparable project or operations management experience, and her reporting function could be readily absorbed by Skrlac, who had prior reporting experience. (ECF 26-4, pp. 35 – 39).

BNY Mellon's EEOC Position Statement (ECF No. 28-10) explains the decision to retain Skrlac as follows.

> The decision to eliminate Ms. Butia's position was fundamentally the result of a determination that there was not a need in Asset Servicing Global Ops for a dedicated reporting manager. Initially, Bradley Skrlac (M/10/31/72), Senior Reconciliation Service Group Manager, absorbed the duties previously assigned to Ms. Butia. Mr. Skrlac has specific subject matter expertise on processes. He has strong technical abilities for system and software and worked on information technology projects pertaining to workflow with developers and vendors. He also was an efficiency expert as he was trained in Six Sigma and is a certified Six Sigma Yellow Belt. In addition, Mr. Skrlac has superior presentation skills. He is

able to pull together the details, translate his subject matter expertise and articulate those details to the senior team.

(ECF No. 28-10, p. 4). In response to Plaintiff's Interrogatories, Defendant further stated "Plaintiff's span of control people and responsibilities were too limited. Others in the department had expertise and experience to absorb her work. Plaintiff did not have the operational management expertise equal to others." (ECF No. 28-11, pp. 4 – 5).

Based upon these factors, Smith recommended Butia's termination. Kevin Smith required Smith to explain his rationale, reviewed the RSG organizational chart, and discussed and evaluated each of the operations and project managers under his supervision. (ECF No. 26-4, p. 39). At the conclusion of their discussion, Kevin Smith agreed with Smith's assessment and Butia's name was provided to human resources for termination in conjunction with the BNY Mellon reduction in force.

Plaintiff challenges Smith's conclusions as pretext for gender and age discrimination, claiming Smith ignored the totality of Plaintiff's background and failed to discount McCracken's technological experience in view of McCracken's lower performance rating as "on-target," his lack of a college degree and minimal operational experience. (ECF No. 29, pp. 12 – 14, ECF No. 26-1, ¶¶ 92 – 93). Plaintiff contends that Smith made his decision without investigating and developing an understanding of her operations and supervisory experience at Mellon in the years 1979 – 1995. (ECF No. 33, ¶¶ 8 – 9). Plaintiff believes that Smith investigated the background of McCrackin and Sklrac but failed to inquire into her background and that this is evidence of discriminatory intent. In addition, Plaintiff contends that Smith violated BNY Mellon's EEOC policies by failing to properly account for her combined length of service to the company of 29 years, which would have provided her a preference for retention over similarly skilled

employees, such as Sklrac and McCracken. (ECF No. 26-1, ¶¶ 4-6). Smith alleges that this discrimination occurred on October 16, 2008, when she was informed of her termination and her work was reassigned to a younger man.

## II.      STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48 (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support

such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.  Timeliness of PHRA Claim

   BNY Mellon contends that it is entitled to judgment in its favor as a matter of law with regard to Butia's PHRA claim, because Butia failed to properly and timely exhaust available administrative remedies.

   To bring a claim under the PHRA, a plaintiff must first have filed an administrative complaint with the Pennsylvania Human Rights Commission ("PHRC") within 180 days of the alleged act of discrimination.  43 Pa.C.S. § 959(h). "If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. The Pennsylvania courts have strictly interpreted this requirement and have repeatedly held that …

'person[s] with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act." Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (quoting Vincent v. Fuller Co., 616 A.2d 969, 974 (Pa. 1992).

Under Pennsylvania law, a charge of discrimination filed with the EEOC that has been forwarded to the PHRC pursuant to their work-share agreement is sufficient to satisfy PHRA's complaint requirements. Colbert v. Mercy Behavioral Health, 845 F. Supp.2d 633, 638 (2012) (internal citations omitted). However, "a claimant cannot rely on the work-share agreement alone to show that the PHRC received his or her claim, but rather, must show that the PHRC actually received the complaint." Id. at 638-39. A complaint is filed with the PHRC on the date that it is received by the PHRC, regardless of whether the complaint was forwarded by the EEOC or filed by the claimant directly with the PHRC." Id. at 639.

In this case, Butia concedes that her alleged discrimination occurred on October 16, 2008, the day she was informed that her position was to be terminated. (ECF No. 29, p. 3). Butia contends that because she filed an Intake Questionnaire with the EEOC on March 4, 2009, or 146 days after the date of her alleged discrimination, her PHRA claim was timely filed. However, Butia did not indicate her intent to dual-file her claim on her EEOC Intake Questionnaire, and there is no evidence that the EEOC forwarded her claim to the PHRC within 180 days of the alleged date of discrimination. Rather, Butia did not evince an intent to dual-file her claim with the PHRC until 183 days later, on April 17, 2009, when she filed her Charge of Discrimination with the PHRC. (ECF No. 26-8).

Despite this shortfall, Butia contends that the filing of her EEOC Intake Questionnaire, without more, is sufficient to constitute filing a charge with the PHRC. For this proposition,

Butia relies principally upon Federal Express v. Holowecki, 522 U.S. 389 (2008), Barra v. Rose Tree Media School Dist., 858 A.2d 206, 211-212 (Pa. Commw. 2004) and the recent decision of the United States Court of Appeals for the Third Circuit in Hildebrand v. Allegheny Center, No. 13-1321, ___ F.3d ___, 2014 WL 2898527 (3d Cir. June 27, 2014).[3]

In Holowecki, the issue before the United States Supreme Court was whether an EEOC Intake Questionnaire form was sufficient to commence a charge of discrimination under the ADEA so as to exhaust available administrative remedies as required by the statute. The plaintiff filed only an EEOC Intake Questionnaire, which the defendant argued did not qualify to constitute a formal charge of discrimination. The United States Supreme Court held that an EEOC Intake Questionnaire may be sufficient to establish that a plaintiff seeking relief under the ADEA has exhausted available administrative remedies if: (i) the Intake Questionnaire and the documents attached provide the basic information regarding the alleged discriminatory act; and, (ii) the Intake Questionnaire contains a request for the agency to take whatever action is necessary to vindicate the complainant's rights. Holowecki, 552 U.S. at 402.

In Hildebrand, the United States Court of Appeals for the Third Circuit applied Holowecki to EEOC Intake Questionnaire forms that were revised after the Holowecki opinion. The Court of Appeals held that where a claimant using the updated form identifies all parties against whom a discrimination charge is filed, and "checks a box" requesting that the EEOC take remedial action, then the claimant "unquestionably files a charge of discrimination." Hildebrand, No. 13-1321, p. 28. Neither opinion, however, addresses the effect of the

---

[3] Given the potential relevance of Hildebrand, supra, to Defendant's Motion for Summary Judgment, the Court entered an Order on June 27, 2014, requiring both sides to file supplemental briefs addressing the issue of the sufficiency of Plaintiff's EEOC Intake Questionnaire for purposes of determining the timeliness of her PHRA claim. However, because it is apparent that Plaintiff failed to provide notice to the PHRC of her claim within 180 days, and the EEOC did not forward her complaint to the PHRC within 180 days, the effect of filing an Intake Questionnaire to toll the applicable limitations period is not relevant to Plaintiff's PHRA claim.

completion of an EEOC Intake Questionnaire on the timing of a charge filed with the PHRC, which is, of course, a matter of state law. <u>Woodson</u>, 109 F.3d at 925.

Plaintiff cites the intermediate appellate court decision in <u>Barra v. Rose Tree Media School Dist.</u>, for the proposition that the filing of an EEOC Intake Questionnaire constitutes notice to the PHRC and preserves a PHRA claim. The issue decided in <u>Barra</u>, however, was whether the date of service of the charge *on the defendant* determines the appropriate limitations period. The Commonwealth Court confirmed that service *on the defendant* is irrelevant to a determination of timeliness, which under both Title VII and the PHRA relies exclusively on the date the charges were filed with the appropriate agency. <u>Barra</u>, 858 A.2d at 211.

The issue before the Court here is whether Butia timely filed her PHRA claim, which is resolved by reference to the contents of her EEOC Intake Questionnaire and the date Butia submitted a charge to the PHRC. Because the Intake Questionnaire does not evidence Butia's intent to dual file with the PHRC, her PHRA claim date is April 17, 2009, 183 days after the alleged act of discrimination. Because the PHRA charge was not submitted to the PHRC within 180 days, Butia's claim is untimely and Defendant is entitled to the entry of judgment in its favor as a matter of law as to Plaintiff's PHRA claim.

### B. ADEA and Title VII Discrimination Claims

#### 1. ADEA Claim

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To succeed on an age-based discrimination claim, a plaintiff must demonstrate that his or her age 'was the "but-for" cause of the employer's adverse decision,' and

that it 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" This showing "can be made either through the use of direct evidence or circumstantial evidence." Henry v. N. Westmoreland Career & Tech, No. 09-751, 2011 WL 1136792 *6 (W.D. Pa. Mar. 25, 2011) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) and Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004)).

As in this case, where there is no direct evidence of discrimination based on age (or sex), and the plaintiff's claims are based on indirect and circumstantial evidence, the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. "The McDonnell Douglas framework requires a plaintiff alleging age discrimination to first establish a prima facie case of discrimination. The prima facie case … 'eliminates the most common nondiscriminatory reasons for the plaintiff's [termination].'" Henry, No. 09-751, 2011 WL 1136792 *6, quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). "The prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id. (internal quotation marks omitted).

Plaintiff concedes that her termination occurred in conjunction with a reduction in force exercise. (ECF No. 29, p. 11). In a reduction in force case, a prima facie case requires four elements: (i) the plaintiff was a member of the protected class, i.e,, was 40 years of age or older (29 U.S.C. § 631(a)), (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the employer retained a sufficiently younger similarly situated employee." Monaco v. Am Gen. Assurance Co., 359 F.3d 296, 301 (3d Cir. 2004); and see, Anderson v.

Consolidated Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002); Davis v. Pittsburgh Public Schools, 930 F.Supp.2d 570, 600 (W.D. Pa. 2013).[4]

"'[O]nce the employee establishes a prima facie case, the burden of production (i.e., of going forward) shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision.'" Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (citing McDonnell Douglas, 411 U.S. at 802). The employer's burden is "relatively light," which can be satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).

"If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." Fuentes, 32 F.3d at 764. To survive summary judgment, "the plaintiff must point to some evidence ... from which a factfinder could reasonably either (1) disbelieve the employer's

---

[4] Butia contends that pursuant to McDonnell Douglas, the fourth element of a prima facie case is satisfied merely with evidence that her position was filled by someone not within her protected class. Butia argues that she is not required to produce additional evidence that she was "similarly situated" to the employee who absorbed her assigned tasks. (ECF No. 29, pp. 6-7). In this respect, Butia misapprehends the law with regard to terminations driven by a reduction in force, which she concedes occurred here. (ECF No. 29, p. 11). In Anderson v. Consolidated Rail Corp., 297 F.3d at 242, 249-250 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit determined that it was appropriate to require a plaintiff in a RIF age discrimination case, to show as part of his or her prima facie case, that the defendant retained someone who was similarly situated in terms of comparable duties or other relevant factors. In this regard, the Court of Appeals agreed with the proposition that "'a plaintiff cannot prevail merely by pointing to other positions for which she was qualified and claim [] that the employer should have allowed her to 'bump' the occupant of that position.'" Id., quoting Skalka v. Fernald Environmental Restoration Management, 178 F.3d 412, 421 (6th Cir. 1999).

Because ADEA is not a bumping statute, as the plaintiffs concede, the plaintiffs must show that the employer retained a similarly situated employee. Were we to hold otherwise, we would be construing ADEA as guaranteeing a protected employee a job at the expense of a sufficiently younger employee. Thus, to present a prima facie case raising an inference of age discrimination in a reduction in force situation, the plaintiff must show, as part of the fourth element, that the employer retained someone similarly situated to him who was sufficiently younger.

Anderson. at 250.

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. Throughout this burden-shifting exercise, the burden of persuasion, 'including the burden of proving "but for" causation or causation in fact, remains on the employee.'" Id., citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254-55, and Starceski v. Westinghouse Elec. Co., 54 F.3d 1089, 1095 n. 4 (3d Cir. 1995).

BNY Mellon has moved for the entry of summary judgment in its favor first, because it contends that Plaintiff cannot set forth a prima facie case of discrimination; and, second, because no reasonable factfinder can find pretext.

### a. Prima Facie Case

For purposes of Defendant's Motion for Summary Judgment, BNY Mellon concedes the first three elements of Butia's prima facie case; i.e., (i) that Butia belongs to a protected class given her age (and gender); (ii) that she is qualified for her position of Manager of Reporting and Risk; and, (iii) that she was subjected to an adverse employment action when her position was eliminated. BNY Mellon contends, however, that Butia cannot establish the fourth element of a prima facie case because there is no evidence that similarly-situated persons outside of her protected class were retained by BNY Mellon when her position was eliminated. In particular, BNY Mellon argues that none of the younger males who retained their positions and assumed Butia's job responsibilities after the reduction in force were similarly situated to Butia at the time of her separation.

Having misapprehended her burden of proof, Butia fails to respond to BNY Mellon's argument and does not attempt to establish that she is similarly situated to the younger men who were retained and, in particular, to Brad Skrlac, who initially absorbed her employment

responsibilities, or to McCracken, who next absorbed her reporting function after Skrlac's reassignment.

A showing of proof to determine whether comparators are "sufficiently situated" must contain evidence that the retained employees had duties that were comparable to those of the plaintiff. Courts must "look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." Monaco, 359 F.3d at 305. Finding that "'[s]imilarly situated' means similar 'in all relevant respects,'" Chief Judge Conti of the United States District Court for the Western District of Pennsylvania held in Davis v. Pittsburgh Public Schools, 930 F. Supp.2d at 600, that the plaintiff could not prove a prima facie case where "[p]laintiff and [her comparator] did not have the same qualifications, did not share the same status as employees, did not have the same certifications, were paid on different pay scales, and worked different durations during the year." Id. The Court contrasted additional work assignments, certifications and status and determined that it could not find that the proffered comparator was "similarly situated" for purposes of establishing a prima facie case for age discrimination.

The cases cited by BNY Mellon provide further guidance as to the relative factors to be considered in a "similarly situated" determination. In Lepore v. Lanvision Systems, Inc. 113 F. App'x 449, 454 (3d Cir. 2004), both proffered comparators were either transferred out of the plaintiff's department before the plaintiff's termination or laid off soon after. The court determined that because neither of the individuals was retained, plaintiff failed to make a successful prima facie case. In Monaco, the court found no evidence that eight subordinate sales vice president/branch managers who the plaintiff directly supervised were similarly situated,

given differences in job function, level of supervisory responsibility and salary. Further, the lone proffered comparator who was similarly situated in terms of job responsibilities was two years older than the plaintiff and so was not "sufficiently younger" to support a prima facie case of age discrimination. 359 F.3d at 306.

In Anderson v. Consolidated Rail Corp., 297 F.3d at 250, plaintiffs presented no evidence that the defendant routinely shuffled workers between departments to positions requiring less experience. Therefore, the court concluded that plaintiffs could not compare themselves to retained employees in entry-level positions or other low-level positions to satisfy the fourth element of a prima facie case. Similarly, in McKenna v. Healthease, Inc., No. 10-3940, 2013 WL 1702639 (E.D. Pa. Apr. 19, 2013) aff'd, No. 13-2458, 2014 WL 3411137 (3d Cir. July 15, 2014), plaintiff's comparator had over three years of corporate fitness experience, plaintiff had none; and had more seniority than plaintiff, who had the least seniority of all employees. Accordingly, the plaintiff could not make out a prima facie case.

Butia points to two employees who she alleges were improperly retained at her expense, McCracken and Skrlac. For purposes of determining whether these two employees were "similarly situated," the Court agrees with BNY Mellon that McCraken is an inapt comparator based upon his location in Massachusetts, and his extensive technology background, upon which Smith was reliant for performing in-house programming and hardware solutions. Plaintiff has not presented any evidence of her technological prowess and, indeed, the only evidence on the subject shows that she had difficulty using an excel spreadsheet. Further, Plaintiff does not contest Smith's belief in the RSG's ongoing need for an employee with McCracken's technology background. Accordingly, McCracken is not a "similarly situated" employee capable of meeting Butia's burden of proof as to the fourth element of a prima facie case.

Butia directly undermines any argument she could present that Skrlac is similarly situated. In her brief in opposition to summary judgment, Butia contends that she was a more valuable employee and that "[she] was not at a position similar to Mr. Skrlac as alleged in the [BNY Mellon EEOC] Position Statement." (ECF No. 29, p. 12). Butia states,

> In 2006, the Plaintiff was given the title of Recon Services Group Manager II, pay grade 11. Mr. Skrlac was a project manager at pay grade 10. The position of RSG Manager II was more important than the project manager position held by either Mr. Skrlac or Mr. McCracken. It was not until after the Plaintiff was terminated in August 2008 that Mr. Skrlac was promoted to the equivalent of pay grade 11. It is impossible to state that either Mr. Skrlac or Mr. McCracken was the equivalent of the Plaintiff given these facts.

Id. Based upon Butia's argument that neither retained employee is "equivalent" to her because of pay grade and the relative importance of her position as an RSG Manager II, it is clear Butia fails establish that BNY Mellon retained a "similarly situated" younger employee. In the absence of such proof, Butia does not present evidence sufficient to present a prima facie case raising an inference of age discrimination in this reduction in force case. Accordingly, BNY Mellon is entitled to the entry of judgment in its favor as to Butia's ADEA claim.

In an abundance of caution, the Court has reviewed the evidence as though Butia had presented a prima facie case, but finds that Plaintiff has failed to adduce sufficient evidence permitting a reasonable factfinder to conclude that the reasons proffered for her termination were pretext.

### b. Pretext

"[A] decision to lay off an employee in a RIF differs from a decision to fire an employee during ordinary circumstances. In either situation, however, we apply the McDonnell Douglas framework. In ordinary times, employees are fired for poor performance; in a RIF, even qualified employees are laid off in order to reduce personnel… But even in a genuine RIF (one

that is motivated on a programmatic level by economic concerns), individuals may not be selected for layoff on the basis of age. For this reason, even in a RIF, we use the McDonnell Douglas framework to expose such discrimination. The employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual." Tomasso v. Boeing, 445 F.3d 702, 707 (3d Cir. 2006).

Pursuant to McDonnell Douglas, where a prima facie case has been established, the burden of production shifts to the employer, BNY Mellon, which must articulate a legitimate nondiscriminatory reason for Butia's layoff. "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id., quoting Fuentes, 32 F.3d at 763.

BNY Mellon argues that its decision to terminate Butia was in conjunction with a reduction-in-force, and that Smith's evaluation of employees and the needs of the RSG going forward placed Butia in the weakest position for retention, resulting in her termination.

Smith testified that after receiving instructions to reduce the number of direct reporting employees, he looked at each manager's role, job responsibilities and skill set to determine which functions could be put together with the fewest number of people. In deciding who to retain, he was "looking for people that had operations experience, people that had project experience, people that had technology experience, or people that had reporting experience. As well as experience with off shore work." (ECF No. 26-4, p. 32). After reviewing these factors, Smith decided that in comparison to the six direct reporting employees in his department, Butia had the least relevant operations management experience and breadth of skills.

Smith believed that given the ongoing reengineering and outsourcing of RSG operations to India, changing his current operations managers was "the most risky" because the personnel in those slots (So, Rihmland and Hairstone) had the most expertise and/or direct contact with the off-shore group. As to the remaining personnel, Smith viewed McCracken's technology background and experience as vital to the department going forward because "there would be more technology demands on the group," requiring McCracken's proven skill set. McCracken had the ability independently perform smaller technology projects involving data and hardware, and could facilitate the projects quickly (ECF No. 26-1, ¶¶ 80-85, ECF No. 26-4, pp. 25-26, 31-33). Smith also believed that in comparison to Plaintiff, Skrlac provided a broader and more diverse skill set with project management experience, at least ten years in operations management, Six Sigma certification, and experience in the reporting work performed by Butia. Based on discussions he had with Butia in 2004 or 2005, Smith understood that Butia had limited operations management experience, no relevant project management and limited technical skills.

Reviewing Smith's statements, the Court finds that BNY Mellon, through Smith, has articulated a legitimate basis for terminating Butia while retaining Skrlac and McCracken. Because BNY Mellon has articulated a nondiscriminatory reason, Butia "must respond by citing evidence that the rationale is pretextual." <u>Fuentes</u>, at 763. To determine whether Butia can satisfy her burden of proof by the preponderance of the evidence adduced through discovery, the Court applies the two-prong test set forth by the Court of Appeals for the Third Circuit in <u>Fuentes</u>. At this stage of the litigation, Plaintiff is required to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764.

### i. <u>Fuentes</u> test - first prong

In order to meet the requirement of the first prong of <u>Fuentes</u>, Butia must do more than show that Smith was "wrong or mistaken" in deciding to lay her off, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Id.</u> at 764 – 65.

"[She] must 'present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.' <u>Kautz v. Met–Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005) (emphasis added). In other words, [plaintiff] must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence,"' and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."  Tomasso, 445 F.3d at 706 (quoting <u>Fuentes</u>, 32 F.3d at 765).

The relevant inquiry must focus on the reasons articulated by the employer; the employer need not be objectively correct, but must have an honest belief in the stated reasons for termination.  <u>Davis</u> 930 F. Supp.2d at 602, citing <u>Watson v. Southeastern Pennsylvania Transp. Authority</u>, 207 F.3d 207, 222 (3d Cir. 2000).

Butia contends that BNY Mellon's proffered reasons for her termination are pretext for unlawful discrimination because, she alleges, (1) BNY Mellon's explanation for her termination has changed over time, giving rise to an inference of pretext; (2) she was selected for termination

by Smith without a thorough assessment of her background; and, (3) a thorough assessment of her background would have established that she is more qualified than certain younger males who were retained.

Plaintiff contends that alleged contradictions in BNY Mellon's discovery responses, EEOC Position Statement, and Smith's deposition testimony demonstrate that the stated reasons for her termination changed over time. (ECF No. 29, p. 9). "It is true that in extreme enough cases, an employer's inconsistencies in its proffered reasons for discharge can constitute evidence of pretext. See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 284 (3rd Cir. 2001) (employer offered new and unrelated reasons for termination at latter stages of litigation); Smith v. Borough of Wilkinsburg, 147 F.3d 272, 281 (3rd Cir. 1998) (employer gave entirely unrelated rationales for termination to EEOC and trial court); EEOC v. L.B. Foster Co., 123 F.3d 746, 753 (3rd Cir. 1997) (deposition and trial rationales were unrelated). In all of these cases, pretext was evidenced by the decision-maker's having totally different and unrelated rationales for the employment decision at different stages of the litigation." Hoechstetter v. City of Pittsburgh, 79 F. App'x 537, 539-40 (3d Cir. 2003)

Here, however, the reasons for Butia's termination have remained entirely consistent throughout the litigation and make clear that to the extent a reduction in force was necessary, Smith believed that Butia's skill set was the narrowest and that her reporting function could readily be absorbed by Skrlac, who possessed a broader scope of knowledge and skills needed for the ongoing re-engineering of the RSG.

First, in its EEOC statement, BNY Mellon proffered that Butia's job duties could be easily consolidated with Skrlac, and "the business could get 'more bang for its buck' by retaining him. In addition to working on information technology projects, Skrlac who had specific subject

matter expertise on processes and strong technical abilities for system and software, was also a Six Sigma Yellow Belt." (ECF No. 28-10). Second, in response to an Interrogatory requesting a detailed description of the reasons why Plaintiff was chose for lay off instead of another individual" in her department. BNY Mellon stated in relevant part, "Plaintiff's span of control people and responsibilities were too limited. Others in the department had expertise and experience to absorb her work. Plaintiff did not have the operational management expertise equal to others." (ECF No. 28-11). Third, Butia points to Smith's deposition testimony, where he expanded upon his assessment of each employee's skill set and function to determine who could readily be replaced. As found in Hoechstetter, supra, there simply is *no* evidence of a "dramatic shift of reasons" or a "contradiction or inconsistency between the interrogatory answers and [Smith's] testimony." Hoechstetter, 79 F. App'x at 540. "In short, there is simply no evidence of any inconsistencies that would lead a reasonable factfinder to conclude that [Defendant's] reasons … were pretextual." Id.

### ii. Fuentes test – second prong

"The court is next required to examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. This prong permits the plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that 'discrimination was more likely than not a motivating or determinative cause of the adverse employment action.' … The kinds of evidence relied upon by the court of appeals under this prong of the Fuentes analysis are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has treated more favorably similarly situated persons not within the protected class." Davis, 930 F. Supp. 2d at

606 (quoting <u>Fuentes</u>, 32 F.3d at 762, and citing <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 644–45 (3d Cir.1998)).

With respect to the first factor, Butia points to her exclusion from the Six Sigma training and profit sharing in 2005 as evidence of prior discrimination against her. However, the evidence presented with regard to both items is uncontradicted and establishes that her exclusion was based on independent factors unrelated to her gender or age. As to the Six Sigma training, Butia concedes that at the time it was offered, training was limited to project managers. (ECF No. 29, p. 13). Given Butia's status as a Manager for Risk and Reporting, and the limited number of available projects, her protected status was not a factor in the decision to exclude her, or the three male Operations Managers who were also excluded from the Six Sigma Training. With regard to the changes in profit sharing, Butia failed to present any evidence contradicting Smith's testimony that no personnel in his department were recommended for an exception to the new policy limiting profit sharing to employees at or above pay grade 12. In addition, the lone comparator employee Butia points to worked in a different department, was female and was two years older than Butia. (ECF No. 26-3, p. 7).

The second factor examines whether the employer has discriminated against other employees in plaintiff's protected class. Here, Butia points to the closure of the Syracuse reconciliation office after the BNY and Mellon merger, which eliminated Lula Staples position. (ECF No. 29, p. 16). Butia posits that the decision to close the smaller Syracuse office occurred solely because it was supervised by a female manager. (ECF No. 29, p. 16). However, the uncontradicted evidence indicates that at the time the decision was made, there were three or four employees in Syracuse and all of the work could be readily transferred to the much larger Pittsburgh office. Ms. Staples was offered a transfer to Pittsburgh to keep her position as a

manager, but declined and opted to retire. Simply, there is no evidence to support Butia's claim that BNY Mellon discriminated against other employees in her protected class.

The final factor examines whether the employer has treated similarly situated persons not within the protected class more favorably. Plaintiff presents no evidence as to this factor and apparently concedes that BNY Mellon's statistical itemization of the twenty employees reporting to Smith, including four employees who were older than Butia, one of whom was a woman, who retained their jobs in the reduction of force that resulted in the elimination of Butia's position. (ECF No. 30, ¶¶ 108 – 113). Simply, there is no evidence of record that BNY Mellon treated differently anyone outside of Butia's protected class.

Butia has failed to present evidence under either the first or second prong of the <u>Fuentes</u> test that discrimination based on her age was at the root of her termination during the post-merger BNY Mellon reduction in force. Because the record shows that Butia cannot satisfy her burden to prove that BNY Mellon's legitimate reason is pretext for discrimination based upon her age, summary judgment shall be granted in BNY Mellon's favor with respect to Butia's ADEA claim.

### 2. Title VII Claim

Butia also presents a Title VII claim alleging that her termination was the result of gender-based discrimination. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Butia must prove that BNY Mellon treated her less favorably during its reduction in force as a result of her gender.

The relevant inquiry as to Butia's Title VII claim at the summary judgment stage mirrors that for her ADEA claim:

> Similar to discrimination claims under the ADEA, the <u>McDonnell Douglas</u> framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. To state a claim for race or gender discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she suffered an adverse employment decision; and (4) the decision was made under circumstances giving rise to an inference that the adverse action was taken on account of plaintiff's membership in the protected class. <u>Makky</u>, 541 F.3d at 214.

> If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. <u>Id.</u> The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes</u>, 32 F.3d at 763.

> Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s], ... and the sole remaining issue [is] 'discrimination vel non' ...." <u>Reeves</u>, 530 U.S. at 142–43, 120 S. Ct. 2097 (citations omitted). The plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. <u>Jones</u>, 198 F.3d at 410.

<u>Davis</u>, 930 F. Supp. 2d at 608-09.

In considering whether Butia has set forth a prima facie case of gender discrimination, this Court finds, based on the same rationale employed in considering her age discrimination claim, that the evidence presented by Butia is insufficient to establish a prima facie case of gender discrimination.

Even if Butia had established a prima facie case of gender discrimination, she has failed to proffer sufficient evidence permitting a reasonable fact-finder to conclude that BNY Mellon's

proffered reasons for her termination are pretext for discrimination based upon gender. In fact, Butia concedes that BNY Mellon provided a legitimate, non-discriminatory reason for termination (ECF No. 29, p. 7), but fails point to any evidence upon which a fact-finder could reasonably disbelieve that Smith's determination of the breadth and depth of each employee's knowledge, experience and skill set was pretext for discrimination based on her gender. For the same reasons that Butia failed to meet her burden with respect to the first prong of the <u>Fuentes</u> test as to her age discrimination claim, she also fails to meet her burden with respect to her gender claim. Similarly, as to the second prong of the <u>Fuentes</u> test, Plaintiff failed to show that BNY Mellon had a history of either discriminating against her based upon her gender or discriminating against other employees in her protected class based upon gender. Having failed to satisfy either prong on the <u>Fuentes</u> test, summary judgment shall be granted in BNY Mellon's favor with respect to Butia's gender discrimination claims.

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 26) filed on behalf of Defendant BNY Mellon is GRANTED. An appropriate order will be entered.


## <u>ORDER</u>


And now, this 13th day of August 2014, upon consideration of the Motion for Summary Judgment filed on behalf of Defendant BNY Mellon, as well as the briefs and exhibits filed in support and in opposition thereto, and for the reasons set forth in the accompanying opinion, IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 26) is GRANTED.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P.

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:      All counsel of record by Notice of Electronic Filing